951 F.2d 1259
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 LOUIS DREYFUS CORPORATION, Plaintiff-Appellant,
v.
LOGAN COUNTY FARM ENTERPRISES, INC., a corporation;
Commodity Credit Corporation; and Leadership
Bank, N.A., Defendants-Appellees.
 No. 91-6189.
 United States Court of Appeals, Tenth Circuit.
 Jan. 3, 1992.
 
 Before STEPHEN H. ANDERSON, TACHA and BRORBY, Circuit Judges.
 
 
 1
 ORDER AND JUDGMENT*
 
 
 2
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9. The case is therefore ordered submitted without oral argument.
 
 
 3
 This case requires us to decide whether Louis Dreyfus Corporation (Dreyfus), a purchaser of grain from Logan County Farm Enterprises (LCFE), knew or had reason to know at the time of the purchase that LCFE lacked authority to sell the grain. Because we agree with the district court that Dreyfus knew or had reason to know of a defect in LCFE's authority to sell the grain, we affirm.
 
 
 4
 Louis Dreyfus Corporation, as part of its diversified business activities, buys, sells, and exports grain, and operates storage elevators. Its Oklahoma grain merchandising operations are directed from the Dreyfus office in Kansas City, Missouri. LCFE was a corporation engaged in the business of grain warehousing, with its principal place of business in Guthrie, Oklahoma. The Commodity Credit Corporation (CCC) is a corporation wholly owned by the United States and operated by the United States Department of Agriculture. Brief of Appellee at 3. The CCC is responsible for regulating agricultural commodity markets and, to that end, operates a price support loan program for farmers. Id. As a result of this program, the CCC has become the largest storer and merchandiser of grain in the United States. Declaration of Collyn Peterson, App. to Appellant's Brief at 103.
 
 
 5
 In late July 1988, Dreyfus contracted with LCFE to purchase approximately 313,000 bushels of hard winter wheat (the Grain). On August 4, 1988, Dreyfus wired approximately $1.19 million dollars to LCFE as payment for 90% of the Grain. The next morning, a representative of the CCC informed Dreyfus by telephone that the Grain was owned by the CCC and that LCFE had wrongly sold it.
 
 
 6
 Dreyfus instituted an action against LCFE and the CCC. With respect to the CCC, Dreyfus sought a declaratory judgment that it had taken clear title to the Grain. Dreyfus sued LCFE on theories of fraud and breach of warranty of title.[1]
 
 
 7
 After a bench trial, the court entered the following judgments:
 
 
 8
 1) in favor of the CCC on Dreyfus' claim for declaratory relief concerning title to the Grain, determining that Dreyfus had reason to know of the defect in LCFE's authority to sell the Grain; Lewis Dreyfus Corp. v. Logan County Farm Enters., No. CIV-88-1382-P, Findings of Fact and Conclusions of Law at 13-15, 18 (W.D.Okla. Feb. 6, 1991) (Findings and Conclusions);
 
 
 9
 2) in favor of LCFE and against Dreyfus on Dreyfus' fraud claim, finding that any reliance by Dreyfus on the misrepresentations made by LCFE was not reasonable and refusing to impose a constructive trust on the funds paid by Dreyfus to LCFE; id. at 18, 23;
 
 
 10
 3) in favor of Dreyfus and against LCFE on Dreyfus' claim that the now bankrupt LCFE breached the warranty of title contained in the contracts for the sale of the Grain; id. at 23;
 
 
 11
 4) and for the CCC on its claim for conversion against LCFE after LCFE had stipulated to the conversion. Id. at 3,23.
 
 
 12
 Dreyfus appeals from the first two judgments of the district court which, as factual conclusions, are reviewed for clear error. Pierce v. Underwood, 487 U.S. 552, 558 (1988). "A finding of fact is 'clearly erroneous' if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made." Cowles v. Dow Keith Oil & Gas, Inc., 752 F.2d 508, 511 (10th Cir.1985) (citation omitted), cert. denied, 479 U.S. 816 (1986).
 
 
 13
 It is helpful to understand some pertinent background facts about the CCC and its program. The CCC provides nonrecourse loans to farmers who, in turn, pledge their commodities as collateral for the loans. Appellees' Brief at 3. If the market price for the commodity falls below the amount of the loan, farmers often surrender their commodity to the CCC rather than repay the loan. Id. The CCC then attempts to sell the commodity, in this case the Grain, on the open market through public auctions from a list of grain inventories published in its "catalog." Id. In order to protect innocent market purchasers of grain or other commodities from ownership claims advanced by the CCC, Congress amended the Commodity Credit Corporation Charter Act to provide that:
 
 
 14
 A buyer in the ordinary course of business of fungible goods sold and physically delivered by a warehouseman or other dealer who was regularly engaged in the business of buying and selling such goods shall take or be deemed to have taken such goods free of any claim, existing or hereafter arising, by Commodity Credit Corporation, based on the want of authority in the seller to sell such goods, provided the buyer purchased such goods for value in good faith and did not know or have reason to know of any defect in the seller's authority to sell such goods. To be entitled to relief under this section a buyer must assert as an affirmative defense and establish by a preponderance of the evidence the facts necessary to entitle him to such relief.
 
 
 15
 15 U.S.C. § 714p quoted in United States v. Kerr Gifford & Co., 136 F.Supp. 771, 773 (D.Idaho 1956).[2] In order to prevail under this section, therefore, Dreyfus had to prove by a preponderance of the evidence that it did not know or have reason to know of the defect in LCFE's authority to sell the Grain. See id. at 773. The buyer satisfies the requirement that it "did not know or have reason to know" by proving that there was "no knowledge whatever on the part of the buyer or any lack of authority on the part of the seller to sell the goods and ... not even suspicious or unusual circumstances which would give [it] reason to doubt the seller's authority." H.R.Rep. No. 154, 84th Cong., 1st Sess., reprinted in 1955 U.S.C.C.A.N.1937. After a review of the record, we agree with the district court that Dreyfus failed to meet this standard.
 
 
 16
 By July or August of 1988, Dreyfus knew or should have known that LCFE did not have authority to sell the Grain. In the spring of 1987, LCFE was removed by the CCC from the list of approved warehouses. Declaration of Paul Hayworth, App. to Appellant's Brief at 95. The removal prohibited farmers who wanted to maintain the government price support loans for their grain from using LCFE's storage facilities. Id. Notice of this removal was published in area newspapers. Id. at 95, 279-89. This information is highly material in the grain business and should have been known by Dreyfus in the ordinary course of its business. See Affidavit of Steve Campbell, id. at 82, 83 (stating that, as a wheat merchant for Dreyfus, he was familiar with LCFE); Declaration of Collyn Peterson, id. at 104 (one primary function of a grain merchant is to gather and relay information affecting the grain trade). Although there was no direct evidence that employees of Dreyfus had actual knowledge of the removal of LCFE from the list of approved warehouses, the seriousness of this action in the grain industry should have come to Dreyfus' attention. The statutory standard for invoking the protection of 15 U.S.C. § 714p mandates that an innocent purchaser not "know or have reason to know" of the seller's lack of authority to sell. It is not unreasonable to conclude that a prudent player in the grain business would and should monitor the local newspapers in a particular market, and that articles regarding the CCC's action against LCFE should have come to Dreyfus' attention. The burden was on Dreyfus to prove by a preponderance of the evidence that it neither knew nor had reason to know of LCFE's lack of authority. While Dreyfus may have proven no actual knowledge of the removal of LCFE from the CCC's approved list, it failed to prove that it had no reason to know such fact.
 
 
 17
 Even more important information was conveyed in October 1987 to Mr. Jerry Barre, the vice president and regional manager of Dreyfus' Kansas City office which conducted the Oklahoma grain trade. The parties stipulated that on October 22, 1987, Mr. Barre received a telephone call from Paul Hayworth, a marketing specialist with the CCC, warning him that the CCC was having problems with LCFE and that Dreyfus needed to be careful. Findings and Conclusions at 4; Rebuttal Affidavit of Jerry Barre, App. to Appellant's Brief at 111. Dreyfus was further advised to clear all purchases of grain from either LCFE or Joe Penwright, Inc., another Oklahoma grain warehousing business, with the CCC before completing a transaction. Declaration of Paul Hayworth, App. to Appellant's Brief at 97. Both Dreyfus and the CCC acknowledged that this type of direct notice from the CCC to customers of troubled warehouses was unusual. Id. at 96; Testimony of Jerry Barre, App. to Appellant's Brief at 50-51.[3] In response to this message, Mr. Barre notified his grain purchasers that they were not to do business with LCFE until further notice. Rebuttal Affidavit of Jerry Barre, id. at 113.
 
 
 18
 In addition to the direct oral notice to Dreyfus, the lots of CCC grain stored with LCFE and Joe Penwright, Inc., were "locked" by the CCC in late 1987. Declaration of Collyn Peterson, id. at 103. This means that the lots of grain stored with LCFE and Penwright and listed in the CCC's catalog were not available for purchase. Id. This procedure is used when a warehouse storing grain is having severe quality or quantity problems. Id. While the decision to "lock" particular lots of grain may not always be communicated outside the CCC, Testimony of Collyn Peterson, see id. at 422, there was evidence before the district court that Mr. Peterson, the Deputy Director of the Kansas City Commodity Office of the Agricultural Stabilization and Conservation Service and the CCC's director of merchandising, had called Mr. Barre in February 1988 to inform him that the locks on the lots of CCC grain stored at the Penwright facility in El Reno, Oklahoma, had been removed. Declaration of Collyn Peterson, id at 103; Testimony of Collyn Peterson, id. at 420. Mr. Peterson testified that he did not inform Mr. Barre that the LCFE lots had been unlocked, Declaration of Collyn Peterson, id. at 103, and in fact told him that the LCFE lots were not available. Testimony of Collyn Peterson, id. at 420-21. Mr. Barre disputed the latter testimony. Rebuttal Affidavit of Jerry Barre, id. at 114.
 
 
 19
 In opposing the conclusion that Dreyfus knew or should have known that LCFE could not sell the Grain, Dreyfus argues that events subsequent to the October 1987 phone call reasonably led it to believe that it was once again safe to do business with LCFE. It bases this argument on its perception that LCFE and Joe Penwright, Inc., were basically one and the same business, and that when the CCC cleared Penwright to resume selling grain, LCFE was tacitly cleared as well. We disagree.
 
 
 20
 While there was evidence that, in 1987, LCFE and Penwright were owned by the same group of shareholders who also acted as corporate directors, Testimony of Clyde Cheatham, id. at 347-48, that both businesses operated for some ten months under the same state warehouse license, id. at 350, and that for a period of time they shared the services of the same grain merchandisers, id. at 354, there was also ample evidence in the record that the two businesses were distinct entities. The parties stipulated that LCFE and Penwright were, in fact, separate corporations with different principal places of business. Findings and Conclusions at 4. There was undisputed testimony that the two businesses had separate bank accounts, separate corporate books and records, used distinct and separate letterhead and operated under separate CCC grain storage agreements. Testimony of Clyde Cheatham, id. at 365-66. The fact that Dreyfus' employees might not have known that the two entities were separate does not excuse Dreyfus from inquiring into the legal status of the companies it did business with before assuming that they were one and the same. Because Dreyfus had notice of facts and circumstances which would cause a reasonably prudent business person to inquire about the relationship between LCFE and Penwright, and because such an inquiry would lead to the development of facts essential to the knowledge of this situation, Dreyfus is charged with such knowledge. See Moran Bros., Inc. v. Yinger, 323 F.2d 699, 702 (10th Cir.1963).
 
 
 21
 Further, the district court was well within its prerogative as a fact finder to believe Mr. Collyn Peterson's recollection of a conversation with Mr. Barre in which Mr. Barre was told that Dreyfus could bid on CCC grain stored with Penwright but that this permission did not extend to grain stored with LCFE. Declaration of Collyn Peterson, id. at 103; Testimony of Collyn Peterson, id. at 420. The finding of the district court that the CCC had not rescinded the October 1987 notice finds support in the record.[4] Thus, it was not error for the district court to conclude that Dreyfus, at the time in contracted with LCFE, knew or should have known of the defect in LCFE's authority to sell the Grain. Because of this knowledge, Dreyfus cannot avail itself of the protection of 15 U.S.C. § 714p.
 
 
 22
 As its second point of error, Dreyfus argues that the district court erred in concluding that any reliance by Dreyfus on omissions or misrepresentations by LCFE was unreasonable, thus precluding its claim of fraud against LCFE. Findings and Conclusions at 21 (citing FDIC v. Palermo, 815 F.2d 1329, 1337 (10th Cir.1987) (reliance on misrepresentations must be reasonable)). We agree with the district court that, for the reasons articulated above, Dreyfus cannot demonstrate that it reasonably relied on LCFE's actions, statements, or omissions.
 
 
 23
 Dreyfus argues that under Uptegraft v. Dome Petroleum Corp., 764 P.2d 1350 (Okla.1988), it was error for the district court to impute knowledge to Dreyfus and then hold that this knowledge barred Dreyfus' fraud claim. Dreyfus, however, had enough actual knowledge of LCFE's problems with the CCC, both in the form of the oral telephone communication from the CCC, which Mr. Barre himself described as "very unusual" and as imparting a warning "loud and clear," and in the absence of any formal recission of the CCC notice, to make any reliance on LCFE's later conduct, without at least some inquiry by Dreyfus, unreasonable.
 
 
 24
 The judgment of the United States District Court for the Western District of Oklahoma is AFFIRMED.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 The estate of LCFE was eventually liquidated in bankruptcy, with unsecured creditors told not to expect to receive anything from the estate. Appellant's Opening Brief at 3 n. 2
 
 
 [2]
 It is undisputed that the grain which LCFE agreed to sell to Dreyfus was owned by the CCC. Findings and Conclusions at 3
 
 
 [3]
 There is evidence in the record that the oral telephone warning was confirmed by a letter sent the following day via telex from the CCC to the Dreyfus office in Kansas as well as to the Dreyfus office in New York. Declaration of Paul Hayworth, App. to Appellant's Brief at 98; Testimony of Denise Hinken, id. at 414 (testifying that she sent the letter to Dreyfus via Western Union's Easy Link computer system). The parties, however, dispute whether it was proven that Dreyfus actually received written notice. We will not reach this matter, because we find, as did the district court, that the oral notice by itself was enough to have alerted Dreyfus to a potential problem with title to the grain. Findings and Conclusions at 14 ("written notice was simply icing on the cake")
 
 
 [4]
 Dreyfus argues that the nine month lapse between the October 1987 notice and the August 1988 sale should imply revocation. Appellant's Brief at 28-31. However, because resolving the question of whether Dreyfus had reasonable cause to know of the defect in LCFE's authority to sell the Grain depends on an evaluation of the surrounding facts and circumstances, see Moran Bros., 333 F.2d at 702, the district court's findings will be upheld if supported by the record. Cowles, 752 F.2d at 511. We find that the record supports the conclusion that no revocation, express or implied, occurred